Good morning, Your Honor. Gordon Carey, and I represent Plaintiff and Appellant Ionian Corporation. In the first instance, I want to clarify something in the opening brief. Judge Hernandez, there are statements that are somewhat confusing in there. Judge Hernandez did not adopt or did not grant the second motion for summary judgment based on the multiple insured argument that was made by Ionian, or by Precision, excuse me. And the basis of his ruling, he actually acknowledged that that was not applicable. The basis was an argument that was made basically in Precision's reply memo in the trial court and not made very extensively, that the word additional insured wasn't included in the language of the property and casualty binder. Precision had made their argument that the multiple interest insured endorsement was controlling, but ultimately after full briefing by Ionian, which pointed out that the multiple interest endorsement applied only to liability coverage. In the reply, although Precision continued to make that point, it said, well, then what we mean is that the only coverage that's available to an additional insured is liability coverage, and there's no coverage available for property damage because the term additional insured is not used in the property damage binder. Judge Hernandez ultimately, I believe, agreed with us that the multiple interest was not controlling, but did pick up and somewhat sua sponte said, but because the multiple interest endorsement is the only one that uses the term additional insured and there's no such term used in the property damage binder, the BPP coverage, there's no coverage for an additional insured. That was the issue that, or that was the finding, essentially, of the judge. I wanted to review briefly the procedural history here to some extent. And it's important because this matter was brought to the attention of the court, trial court, on three different occasions. I mean, the real issue. First country, Precision's, excuse me, Ionian sued country mutual, the insurer. In that lawsuit, Ionian contended that it was the insurer. We referred to ourselves as additional insured, loss payee, third-party beneficiary, various terms, and full cross motions for summary judgment were filed by both Ionian and country mutual. And at the conclusion of those arguments and briefing, Judge Stewart held that Ionian was an additional insured because Mr. King, a country's agent, had the authority to orally bind Ionian to coverage and had done so based on his own testimony and depositions and an e-mail sent by his assistant. Yeah. Now, pardon me for interrupting. There are a lot of moving parts to this, or maybe I want to say there are a lot of procedural complexity to this case. At what point and for what reason was this case reassigned from Judge Stewart? Judge, the reason, as I understand, the reason was because when Precision Seed came into the picture, they refused to sign a consent to a magistrate. I see. So they revoked whatever authority Judge Stewart had. I got it. Well, I'm not sure that the — well, I guess that technically that would be true, but don't forget on the second go-round of summary judgments, Judge Hernandez adopted and affirmed her rulings on Precision's. No, I got that. But I was trying to figure out just why did we get the change from Judge Stewart to Judge Hernandez. And it sounds as though it was because Precision says we don't consent to appear in front of the magistrate. To trial. To trial in front of the magistrate. Yeah. But so getting back and just briefly, I don't want to take up all my time, but so at the conclusion of the first motion for summary judgment between cross motions, between Ionian and country, Judge Stewart said Mr. King bound coverage, citing ORS 742, the oral binder provision, and said he bound coverage. And at that point, country basically was prepared to pay the proceeds to Ionian until Precision then made a claim to them. And at that point, country interpled the funds and joined Precision. Then Precision made a claim, essentially in that proceeding, that country had wrongfully made us uninsured. On condition that that be dismissed and made in the companion case, country was dismissed. Let me try to cut through some of the procedural stuff here. Okay. As I understand it, it is conclusively established that Ionian owned the building and that Precision was a lessee. Is that correct? I believe that to be correct, although that is the subject of their cross appeal. Yes. But I think we've got a holding to that effect in the lower court. Yes. I believe it's also true that country, the insurer, is out of the picture. They've said, here, take all the money. Somebody is entitled to it. It's not us. So the fight is now purely between you, your client, the owner of the building, and Precision, the lessee. Correct. Assuming we stick with the proposition that your client owns the building. Correct. There's a provision in the policy that says that a payout under the policy will go only up to the ownership interest of the insured. If that's enforced according to its own terms, gives to Precision only the value of its personal property and the value of its leasehold. That would be correct. That leaves a lot of money, it seems to me, left over to go somewhere. I don't understand why it's supposed to go to Precision to the extent that we have fulfilled any obligation of the insurance company to pay off under the policy for lost personal property and for the value of the leasehold as lessee. That's an interesting effect of the decision. So what does that do, if anything, to your argument about unjust enrichment? That's where I'm headed. So I understand you've argued unjust enrichment. Tell me how Oregon law would treat unjust enrichment under these circumstances. All right. We made a motion to amend to impose a constructive trust or equitable lien on the proceeds in the event that a jury concluded that Mr. King did not have Precision's consent to add us. We made that motion after Judge Stewart ruled the second time that the issue was whether Mr. King had authority. She realized, she ruled that he had apparent authority. He had certainly had actual authority from country. But whether or not he had authority this time in the ruling on the second cross motions, she said, but we didn't, the first ruling that I made was not binding on Precision because they weren't parties. Precision has raised the issue of whether Mr. King. I'd like to enter into the debate, okay? And I want to get a practical handle on it. This is a procedural mess, okay? All right. I got it. We're talking about what, $360,000 of insurance? What are we talking about precisely? Is there an insurance policy that has a limit to it here? It's $350,000 for the warehouse and it was $12,500 or $12,750 for the motor control system. For the what? Motor control system. All right. So that's the insurance we're talking about. Yes. All right. So if we were to determine and agree that the ownership is still with your client, right, then we have a pot of money here. It's not like millions of dollars we're talking about. Probably the legal fees here have exceeded the insurance coverage already by dealing with this hornet's nest that you're spending most of your time talking about here. But the substance of this is that how are we going to divide up this pot? It seems to me you have a leasehold interest and insurance should go to Precision in respect to what its interest is, and then you have the ownership interest. Why can't that simply be resolved by a court or the parties sitting down and just agreeing amongst themselves perhaps as sensible people instead of making all these motions and coarse motions and all these fancy types of legal maneuvers? Have you tried to do that? Have you talked to each other about resolving this case? Well, Your Honor, it's not in the record, but certainly we talked a great deal to Country. In fact, they were ready to pay us when Precision came in. Well, Country is out of this thing. Right. But there's a pot here, and I think that what it comes down to in the real world is the insurable interests of the owner and the insurable interests of the lessee. Why is that not as simple as that? What am I missing here? Well, Your Honor, I think we raised that point, but we've had no response from opposing counsel. I mean, there's been we've tried to go through the mediation program here in this Court. You went through the mediation program here? Yes, Your Honor. I mean, they invited us. We syndicated. We were willing. But Precision said they were not willing. They want their positions that they are the rightful owner and therefore they're not interested in discussing settlement? Their position is that we are not uninsured, they're the only insured, and they're entitled to all the money. Okay. Okay. Why don't we hear from Precision, and then we'll give you a chance to respond. All right. Thank you, Your Honor. May it please the Court. I'm Doug Bragg. Excuse me. I'm one of the attorneys for Precision C. And I guess it makes the most sense to start off with what questions or concerns can I address of yours, maybe start with the practical issues that you just raised. If we were to hold that, you know, Ionian is the owner of the building, what would be your position then in terms of resolving this litigation without having to make 700 more motions? I think that the ownership of the building isn't really the main question here. The question is what does additional insured mean in this insurance policy? That's the question. No. How about answering the question that Judge Block asked? Fair enough. I don't think that it makes much difference. No. Depending upon how the Court addresses the issue of what does additional insured mean under the policy. If the Court agrees with Ionian that additional insureds are entitled to insurance benefits under the business personal property coverage, then the status of owner versus seller would make a difference as to what are those relative insurable interests. Yeah. I'm sorry. I'm sorry. I apologize if this is confusing, but if the Court determines that additional insured is only a liability protection, as the policy says, then whether or not Ionian was selling the property or was the owner of the property wouldn't make any difference as to its right. Yeah. Well, doesn't the policy give a country the right to adjust losses with the owners who are lost or damaged property? Isn't there a provision in the policy that gives them that authority? The country has the ability to make that election if they choose, but they chose to deny Ionian's claim to the money and not adjust it with them. The result of that denial was a year of litigation with Ionian, at the result of which the Court found that Ionian was an additional insured. Country, for whatever reason, decided to give up the fight, put the money into the Court, and leave. It never resolved the question of whether or not Ionian or Precision was entitled to the money. It was looking at a total loss. It was going to have to be cut. So would they have had the right to have made that decision as to how the baby was going to be cut? I think the country could have said that as an additional insured, Ionian wouldn't have been entitled to anything. Or that they could have divided up the proceeds between the lease interests and the ownership insurance, right? They could have made that election. They had that authority under the policy, right? Yes, they did. So why as a practical matter can't we really proceed on that basis, if there's a legal way of doing it, and see whether we can get you folks to sit down, you know, now that country has put the money in play, and have it resolved by a court or maybe some intelligent mediation or negotiation? We're not talking about millions of dollars here. Judge, I understand. And at the outset of this, and none of this is in the record, but this is my recollection of what happened, is after country agreed to put the money into the court, and a dispute came up between Ionian and Precision as to who was going to get what, Mr. Skirtis and Mr. Clough, the representatives of the two companies, met in my office in our conference room with no attorneys present, and they hashed out a deal. The next day, Mr. Skirtis reneged the deal. He said, no, we don't have a deal. We went through litigation. A year of litigation, and I think that things became personal between those two individuals. We're talking about two small businesses. The mediation program, we were willing to, in my recollection, we were willing to go through the mediation program. It was Ionian that said, no, there's no point. Obviously, we have disagreements as to that, but I would be willing to sit down and do this. I believe Precision would be willing to sit down and mediate, but that just hasn't been an option that the parties have been able to pursue. Okay. There's a voting here. I mean, it's a practical matter, and you sort of suggested that there's some bad blood or not really cooperation amongst the warring parties here to try to dissolve this matter that may have really given you an opportunity to make a lot of legal fees over the years. Your Honor, my fees are irrelevant. We're not hourly on this one. It seems that this is a case which people should sit down and look at this in a practical way, but, you know, let's see how it plays out. Anything else? Well, I would like to, if the Court has any questions about our contract interpretation issues or ---- Let me interject. You heard a version of this already when I was speaking to your adversary. As I look at the policy, it limits the obligation of the insurance company to pay out the insurable interest of the insured party. And the insurable interest of your client, Precision, is any property that was damaged and any ownership interest in the building. And if you're just the lessee, the value of that ownership interest in the building is the value of the leasehold. That strikes me as when you add all that up in terms of what's an insurable interest under the terms of the policy, it's far less than $350,000. Am I wrong? I think you are, Your Honor. Because? Respectfully. You can be as respectful as you want. Tell me why I'm wrong. Okay. The policy talks about the financial interest, not ownership interest. So the first question is, what is the financial interest? Tenant improvements could be included in that. My client put down new asphalt. They did some work on the roofing. All of this would be part of their financial interest, their use interest in the building. The other issue is that Oregon, in the course of Miller v. Gold Beach and Yoshida, talked about similar circumstances where a tenant, a lessee, purchased an insurance policy, did not name the landlord as an insured under that additional insured loss pay, whatever you want to call it. And in Miller and in Yoshida, the issue was whether or not there was an excess payment by the insurance company beyond the insurable value of the tenant's interest, whether or not the landlord was entitled as a remainder man for that additional money. And the Court ruled that it was not. The question of whether or not country ---- Did the Court rule then that the tenant was entitled to the full amount beyond the financial interest? The Court ruled that the tenant was entitled to the full amount paid by the insurance company. If country wanted ---- Beyond the financial interest of the tenant? Yes. And did the insurance policy have the same clause in it as this one does? We're talking about a policy from 1933. So you don't know. I don't know. But what I do know is ---- Because this clause is very clear, that the payout that you're entitled to under that is limited to your financial interest. But that would be, I believe, a dispute between country mutual insurance and precision. C is whether or not country overpaid ---- I understand that. But country didn't overpay you. Country paid it as an interpleader, saying, okay, Court, you divvy it up. Country didn't pay you the full amount. Country just said, we're out of here. The expense of litigating this has gotten too much. We're going to pay too much in attorney's fees. I just don't get how you have a good faith claim to more than the insurable interest of your client, given that term in the policy. There's been no determination as to what that financial interest was. That evidence was ---- No, I got that. But let's say that ---- I'm just making up the number. Let's say that your client has an insurable interest within the terms of the policy of $100,000. I'm making that number up. I don't know what the number is. I don't see how in good faith your client has a claim to more than that amount. Under the terms of the insurance policy, precision is the only one with entitlement to recover the proceeds of the policy. I got that. But you're not yet getting my question. It seems to me under the terms of the policy, the payout you're entitled to under the policy is limited to the financial interest of precision. And if the financial interest of precision as defined in terms of the policy is only $100,000, that's all you're entitled to under the policy. Now, there's a lot more money sitting in the pot because of the interpleader, but I don't see that you would have a legal claim to that money if you were proceeding against the insurance company. What am I missing? If we were proceeding against the insurance company, the question would be, and you're correct, is what can we prove our financial interest is versus the $350,000 policy limits and what should the insurance company pay? I agree 100 percent. But the insurance company decided to tender the full policy limits for the building. It was a total loss. To be divvied up between legitimate claimants. For the court to determine who amongst them gets it, whether or not it's splitting, whether or not one party or the other party gets all of it. Well, I'm speaking only for myself. So we've not consulted on this case ahead of time. I do not know Judge Bloxfield on this question. I do not know Judge Trostfield on this question. But I have to say I would be inclined to reverse and to remand and send it back to the district court to determine the amount of your client's insurable interest within the terms of the policy and that the remainder go over to Ione and game's over. You guys can finally go home. What's wrong with that result? Other than that's inconsistent with Miller and Yoshida, I understand the court's inclination. Now, Miller and Yoshida, is that old Oregon case? Yes. Let me look. Okay. I've not yet read it. Do you have the citation right handy? You probably got it in your brief. If it's in your brief, don't worry about it. It was. But I have it. I have both cases right here, Your Honor. Okay. Okay. But I'll go back and read that case. But, again, I'm not speaking for my colleagues. But at some point, this has got to come to an end. This is just a total waste of time, waste of money for everybody over a fairly small amount of money. I agree, Your Honor. I agree. It's all right. Well, then I — And we can ask you guys to go to mediation to do it that way or we can just do it ourselves. I've got two people I need to talk to before we get there. Okay. Thank you. Response? Your Honor, I can tell from your questions that you really don't want to hear more of the procedural history. But I do want to respond to something that was said, because it's not in the record and counsel has made a representation. And perhaps you will understand why we're here. Counsel is correct. The principles met. They came to an agreement. I was in the course of preparing a settlement agreement and writing a check when Mr. Millard, Mr. Bragg's partner, called and said he wouldn't allow his client to accept that amount of money. I then got authority from my client to increase that, as I recall, 50 percent, and they still wouldn't accept it. Just so you know, we have a case in state court to protect ourselves after this ruling, bring an action on the lease, which required defendant to repair. We went through mediation on that case, Your Honor. We reached a settlement with Mr. Gidley down the street, and they were negged on that agreement after spending all that money on mediation. I want to make sure the record is clear, and I agree with the court, we have wasted a lot of time and money. And I'm not going to ‑‑ if you want me to stop, I will stop. I'm not sure I want to get too deep in the weeds of settlement negotiations that did or didn't work out. I understand the court's concerned about the amount of money and time. I am, too, but I want you to understand we haven't had a choice. I wish you were back in the district court and Judge Block were your district judge, because he'd be beating everybody about the head and shoulders, and you wouldn't survive before until lunchtime without settling this case. I wish we were. Okay. Well, he's the ‑‑ but we're unfortunately at the court of appeals. I'm stuck here, yeah. Is there ‑‑ does the court even ‑‑ I mean, I wanted to talk a little bit. You don't want to hear any more. Well, you've got two minutes, and you can say whatever you like. You're not going to listen to it. I don't suppose there's much. All I wanted is ‑‑ I did want to address, if you get to the merits, I mean, I think everything else has been briefed. Regarding the timeliness of their motion, I would point out two things. Going to their argument that they have a valid interest in the land, legal interest, I mean, that they were buying the land, this contract, this letter agreement is valid. All the arguments they made, I think the Court would recognize, and the case they relied on most were specific enforcement cases, whether the agreement was definite enough to be enforced. Judge Stewart dismissed that. Judge Hernandez affirmed on the grounds that, you know, there's no jurisdiction. So they have been ‑‑ all their arguments were directed to whether it was definite enough. That's not ‑‑ that's not relevant. The point is that the letter agreement did not comply with a valid real estate contract, and therefore they had no right as the landowner to these proceeds. Second, during the course of their responsive brief, they contended that somehow we had not raised sufficiently the argument about the oral binder so that we were foreclosed from arguing it here. They never said what we were supposed to do. We brought ‑‑ we raised it in the first motion. Judge Stewart agreed. We raised it in the second motion, the first one that they filed. Judge Stewart agreed. And Judge Hernandez adopted it. And we raised it in response to their motion for summary ‑‑ second motion for summary And Ionia ‑‑ and Precision and Judge Hernandez ignored it. I don't know what else we were supposed to do. We responded on the merits. As I said, we don't agree with the argument that the policy issued two years later or two months after the fire, later after the fire, that the language, the fact that the coverage, BPP coverage didn't say the words additional, precludes us. What they're arguing is an exclusion, but there was no such exclusion. That's all I can say, Your Honor. Okay. Thank both sides.
judges: Block, Trott, Fletcher